# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ANGEL D. MENDEZ, SETH OGILVIE, ORI WASSERBURG and NANCY DONACKI-THOMPSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>OPTIMAL BLUE, LLC; BLACK KNIGHT, INC.; CONSTELLATION SOFTWARE, INC.; ROCKET MORTGAGE, LLC; UNITED WHOLESALE MORTGAGE, LLC; WELLS FARGO BANK, N.A.; JPMORGAN CHASE BANK, N.A.; LOANDEPOT.COM; BANK OF AMERICA, N.A.; FAIRWAY INDEPENDENT MORTGAGE CORPORATION; U.S. BANK NATIONAL ASSOCIATION; FREEDOM MORTGAGE CORPORATION; GUARANTEED RATE, INC.; NEWREZ, LLC; CROSSCOUNTRY MORTGAGE, LLC; PENNYMAC LOAN SERVICES, LLC; GUILD MORTGAGE COMPANY, LLC; CITIBANK, N.A.; FLAGSTAR BANK, N.A.; NATIONSTAR MORTGAGE, LLC; NEW AMERICAN FUNDING, LLC; CMG MORTGAGE, INC.; AMERISAVE MORTGAGE CORPORATION; BETTER MORTGAGE CORPORATION; FIRSTBANK; CHURCHILL MORTGAGE CORPORATION; FIRST COMMUNITY MORTGAGE, INC; MOVEMENT MORTGAGE, LLC; AND BEELINE LOANS, INC.<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br><br>**CLASS ACTION COMPLAINT** |

# GLOSSARY

**Annual Percentage Rate (APR):** the cost borrowers pay each year for borrowing money, including fees for taking out the loan, expressed as a percentage.

**Borrower Credit Characteristics:** the factors lenders use to determine a borrower's credit-worthiness, which include: character (their credit history); capacity (their debt-to-income ratio); capital (how much money they have); collateral (assets backing the loan); and conditions (the purpose of the loan and prevailing interest rates).

**Concessions or Lender Credits:** money a lender gives the borrower to help cover closing costs and reduce the amount that must be paid by the borrower at closing.

**Interest or Mortgage Rate**: the interest charged for a home loan represented as an annual percentage.

**Lender:** the secured creditor or creditors named in the debt obligation and document creating the lien. For loans originated by a mortgage broker that closes a federally related mortgage loan in its own name in a table funding transaction, the lender is the person to whom the obligation is initially assigned at or after settlement.

**Lender's Margin:** the portion of the interest rate (or total borrower cost) above baseline mortgage pricing (i.e., par base price), beyond loan-level price adjustments and other risk-based pricing, that captures profit, compensation, and additional markups embedded in the lender's rate structure.

**Loan and Business Data:** loan originators utilize a wide range of loan and business data to assess creditworthiness, make informed lending decisions, and manage risk throughout the loan origination process. Loan data includes borrower information, income and employment, credit history and score, assets and debts, property information (for secured loans), loan characteristics (loan amount, interest rate, term, and loan purpose are key elements), and application history. Business data includes lending market trends, competitor analysis, loan performance data, loan originator performance data, and customer relationship management (CRM) data.

**Loan Estimate:** a form borrowers receive after applying for mortgages that contain information such as the estimated interest rate, monthly payment, and total closing costs.

**Loan Officer:** an individual who originates a loan, who may work for a depository or non-depository lender.

**Loan Officer Compensation:** the amount loan officers are paid, which is typically a commission calculated as a percentage of the total loan amount, but could also be hourly, salaried, or through non-term-based criteria such as volume or quality of submitted loans.

**Loan Originator:** the individual or entity that helps borrowers secure loans in the mortgage transaction; a lender or mortgage broker.

**Loan-Level Pricing Adjustments (LLPAs):** a fee charged to mortgage borrowers based on the borrower's level of risk, using factors like credit score, loan purpose, occupancy, number of units, and loan-to-value ratio.

**Market**: the marketplace where mortgage loans are originated, funded, traded, and invested in. This includes primary and secondary markets.

**Primary Market:** where loan origination takes place, where home buyers get their loans.

**Secondary Market:** where lenders sell the rights of mortgage to investors after the loan closes.

**Mortgage Broker:** a person (other than an employee of a lender) that renders origination services and serves as an intermediary between a borrower and a lender in a transaction involving a federally related mortgage loan, including such a person that closes the loan in its own name in a table-funded transaction.

**Mortgagee:** the lender or entity that provides the funding for the mortgage.

**Mortgage-Backed Securities ("MBS"):** packaged or pooled home loans that are then resold to investors.

**Par Rate:** the standard interest rate calculated by an underwriter based on the borrower's credit application, prior to any points being applied.

**Mortgage (or Cost, Rates, and Price):** the net costs incurred or benefits foregoing by a borrower to obtain a residential mortgage loan, including all monetary and non-monetary outlays, both explicit and implicit, incurred by the borrower over the life of the loan to obtain and maintain mortgage financing, encompassing direct payments, fees, and opportunity costs, whether embedded in the interest rate, charged upfront, presented as a Concession, or realized through contractual terms.

**Rate Spread:** the difference between a loan's annual percentage rate and yields on newly issued mortgage-backed securities.

**Servicing Release Premium (SRP):** a one-time fee paid to a lender when they sell the servicing rights to a mortgage.

1. Plaintiffs Angel D. Mendez, Seth Ogilvie, Nancy Donacki-Thompson, and Ori Wasserburg ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and upon the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on violations of federal antitrust laws against Defendants: (1) Optimal Blue, LLC; (2) Black Knight, Inc.; (3) Constellation Software, Inc.; (4) Rocket Mortgage, LLC; (5) United Wholesale Mortgage, LLC; (6) Wells Fargo Bank, N.A.; (7) JPMorgan Chase Bank, N.A.; (8) Loandepot.com; (9) Bank of America, N.A.; (10) Fairway Independent Mortgage Corporation; (11) U.S. Bank National Association; (12) Freedom Mortgage Corporation; (13) Guaranteed Rate, Inc.; (14) NewRez, LLC; (15) CrossCountry Mortgage, LLC; (16) PennyMac Loan Services, LLC; (17) Guild Mortgage Company, LLC; (18) Citibank, N.A.; (19) Flagstar Bank, N.A.; (20) Nationstar Mortgage, LLC; (21) New American Funding, LLC; (22) CMG Mortgage, Inc.; (23) AmeriSave Mortgage Corporation; (24) Better Mortgage Corporation; (25) FirstBank; (26) Churchill Mortgage Corporation; (27) First Community Mortgage, Inc; (28) Movement Mortgage, LLC; and (29) Beeline Loans, Inc.

## I.    INTRODUCTION

2. This suit exposes a nationwide conspiracy among Defendants to artificially inflate residential mortgage rates and fees across America. For decades, residential mortgages have served as the primary vehicle enabling Americans to achieve homeownership. From at least 2019 to the present, Defendants have exploited their control of the residential mortgage industry to orchestrate a price-fixing scheme that has inflicted substantial damages on Plaintiffs and the Class.

3. The conspiracy operates through a sophisticated data-sharing network. Defendants include Optimal Blue, LLC ("Optimal Blue")—the dominant market intelligence and pricing

software provider in the U.S. mortgage industry—and numerous Loan Originator Defendants—financial institutions that write mortgages using Optimal Blue's tools to share competitively sensitive information and coordinate Mortgage Pricing. Plaintiffs purchased residential mortgages whose Costs were impacted by Defendants' conspiracy.

4.      The mechanism of the conspiracy is Optimal Blue's software arsenal. Loan Originator Defendants coordinate their residential Mortgage Pricing through Optimal Blue's software tools, in particular, Optimal Blue's "Competitive Analytics" and "Competitive Data License" tools (collectively, the "Business Analytics Tools"). First launched in 2019, these tools require Loan Originator Defendants to surrender an unprecedented quantity and quality of non-public, competitively sensitive, granular, real-time data covering every component of their residential Mortgage Pricing and profit margins. As Optimal Blue brazenly declared, "we've opened up the kimono . . . and gotten all that pricing detail to our clients."[1] Armed with this intelligence, Loan Originator Defendants abandoned competition and instead coordinate to extract maximum profits from homebuyers.

5.      The data proves the conspiracy's devastating impact. Since January 2020, rate spreads (the difference between a loan's annual percentage rate ("APR") and the average prime offer rate as calculated by the Consumer Financial Protection Bureau ("CFPB")) for mortgages issued by Optimal Blue users were approximately 2.68 basis points (49.2%) higher than mortgages from non-users. More damning still, Optimal Blue users' rate spreads after 2019—controlling for pandemic effects and other variables—were 9.6 basis points higher than their pre-2020 baseline, representing a massive windfall extracted from American homebuyers.

---

[1]      FINTECH HUNTING MORTAGE CHANNEL, *Transforming Mortgage Lending with Data: Insights from Optimal Blue's Brennan O'Connell*, at 10:45 (YouTube, Sep. 11, 2024), https://www.youtube.com/watch?v=B-SEFjomBk0.

6.      Each Loan Originator Defendant agreed to surrender its most sensitive competitive data to Optimal Blue and competitors as the price of admission to this cartel. They understood this quid pro quo would grant them reciprocal access to rivals' pricing intelligence. Optimal Blue celebrates this mutual vulnerability, boasting that its Business Analytics Tools derive power from the widespread use of its products by Loan Originators across the country and all of the loan-level data they share.[2] As Optimal Blue advertisers, "we give lenders a clearer view of pricing components and help them understand how they compare to competitors. Plus, with each additional user, the power of our network grows."[3]

7.      The scope of shared intelligence is breathtaking. Optimal Blue's Business Analytics Tools provide users with daily, non-public, real-time, loan-level data dissected at the local level. Specifically, the tools provide real time, post-lock[4] data on, among other matters, each Loan Originator Defendant's margin on individual loans, loan-level pricing adjustments (LLPAs),[5] Concessions, Servicing Release Premiums (SRPs), Loan Officer Compensation[6] and Borrower

---

[2]    Loan level data refers to the specific details and information associated with each individual mortgage application and loan.

[3]    *Optimize Your Advantage with Unrivaled Pricing Accuracy*, OPTIMAL BLUE (May 20, 2024) https://engage.optimalblue.com/optimal-insights/optimize-your-advantage-with-unrivaled-pricing-accuracy.

[4]    To "lock" a mortgage application commonly refers to an option exercised by the borrower, at the time of the loan application or later, to "lock in" the interest rate and discount points prevailing in the market at that time with a specific loan originator. The loan originator and borrower are committed to those terms, regardless of what happens between that point and the closing date subject to certain conditions.

[5]    Fannie Mae's Loan-Level Price Adjustments (LLPAs) are risk-based fees Fannie Mae applies to conventional loans based on factors like credit score, loan purpose, occupancy, number of units, and loan-to-value ratio.

[6]    Payment to a loan originators is based on a fixed percentage of the loan amount, a salary, hourly rate, or non-term-based criteria such as volume or quality of submitted loans, in accordance with CFPB Reg-Z.

Credit Characteristics[7]—all broken down to the branch and loan officer level. This intelligence would never be available in real-time to competitors in a functioning market. In any legitimate competitive market, Loan Originators would guard this data jealously. Instead, Defendants freely share this intelligence as the price of cartel membership, ensuring uniformly inflated mortgage prices for American families.

8.    Optimal Blue openly celebrates how its tools eliminate price competition:

> "With +900 mortgage lenders, Pricing Insight[8] provides access to the largest base of lenders in the country, enabling you to see how your product's current BESTX pricing compares to other lenders in any given market segments. Since pricing comparisons are displayed in real time, you can easily adjust margins and republish as necessary to compete smarter and more effectively every day."[9]

9.    The conspiracy continues to expand; in 2025, Optimal Blue advertised that it has approximately 3,500 lenders.

10.    Optimal Blue is also categorical, that it provides its clients with competitively sensitive information not available publicly or through its competitors' software. As Kimberly Melton, Optimal Blue's Director of Client Services, said:

> "I am constantly telling our clients about Pricing Insight. It is the only tool that *provides actual rates and live pricing* so you confidently go about your work, and truly price competitively. *It's not survey pricing results like competitors offer, but rather, real-time insight* into an effective pricing strategy."[10]

---

[7]    Borrower credit characteristics refer to all quantifiable aspects of a consumer's credit profile such as credit score, debt-to-income ratio (DTI), loan-to-value ratio (LTV), and other underwriting factors that mortgage lenders and regulators use to assess credit risk in mortgage applications.

[8]    "Pricing Insight" refers to a data visualization available to Competitive Analytics users.

[9]    *Originator Pricing Insight*, OPTIMAL BLUE, https://www2.optimalblue.com/originator-pricing-insight (last visited October 2, 2025).

[10]    *Id.*

11.     Loan Originators, too, have gushed about how data from Optimal Blue has allowed them to nearly double their margins without concern of being undercut by competitors:

> "*Prior to partnering with Optimal Blue, it felt like we were working in a black box, with limited visibility into the bigger picture. We were leaving so much money on the table . . . .Now, we can raise margins where it makes sense or get really competitive in specific MSAs without tightening everywhere. **We were able to nearly double our margins from 1.78% in November 2024 to 3% in July 2025***."[11]

12.     The conspiracy's effects have compounded the existing housing affordability crisis in Nashville and across Tennessee. In neighboring Rutherford County, the average monthly mortgage payment has surged 54.7%, increasing by $812 per month between 2022 and 2025—from $1,483 to $2,295 monthly for a median-priced home that costs nearly the same price.[12] Statewide, Tennessee homebuyers now face monthly mortgage payments of $1,657, representing a crushing $628 increase from the $1,029 they paid in 2022.[13] Local realtor Jazmyn Bethel acknowledged the impact of small changes in interest rates on Nashville families, explaining that modest interest rate reductions lead to a "$200 to $300 a month" reduction in mortgage payments, which "is the difference between getting groceries or not being able to get groceries" for homebuyers.[14]

---

[11]     *Beeline Loans nearly doubles margins in just eight months with Optimal Blue*, OPTIMAL BLUE, https://engage.optimalblue.com/hubfs/Case%20Studies/Case%20Study_Beeline%20Loans-WEB.pdf (last visited October 3, 2025).

[12]     *TN Homebuyers Hit Hard by Rising Mortgage Rates: Rutherford County Sees 55% Spike in Monthly Payments*, WGNS NEWS (MAY 23, 2024) https://www.wgnsradio.com/article/92993/tn-homebuyers-hit-hard-by-rising-mortgage-rates-rutherford-county-sees-55-spike-in-monthly-payments.

[13]     *Id.*

[14]     Patsy Montesinos, *What the Federal Reserve rate cut means for your mortgage and savings*, WTVF (Sep. 19, 2025) https://www.newschannel5.com/news/what-t.he-federal-reserve-rate-cut-means-for-your-mortgage-and-savings.

13.     Simply put, Defendants' price-fixing scheme has transformed the American dream of homeownership into a financial nightmare for countless Nashville and Tennessee families.

14.     This conspiracy violates federal antitrust law on multiple fronts. The exchange of non-public, competitively sensitive information through Optimal Blue enabled Defendants to fix and artificially inflate Mortgage Prices in violation of Section 1 of the Sherman Act. The information exchanged independently violates Section 1 as an unlawful information exchange. The supracompetitively-inflated Mortgage Prices paid by Plaintiffs and the Class represent the predictable and intended consequences of Defendants' illegal conduct.

15.     Plaintiffs seek damages and permanent injunctive relief to dismantle this conspiracy and prevent Optimal Blue, Loan Originator Defendants, and their Unnamed Co-conspirator Loan Originators from continuing to manipulate residential Mortgage Prices through the sharing of competitively sensitive information via Optimal Blue's Business Analytics Tools.

## II.     JURISDICTION AND VENUE

16.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and the other members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

18.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at

all relevant times, one or more Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

19.     This Court has personal jurisdiction over each Defendant because each Defendant originated a residential mortgage with individuals in the District, and also: (a) transacted business throughout the United States; and (b) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States. Moreover, this Court also has personal jurisdiction over all incorporated Defendants pursuant to the Clayton Act, 15 U.S.C. § 22.

20.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

21.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    THE PARTIES

### A.    Plaintiffs

22.     Plaintiff Angel D. Mendez ("Plaintiff Mendez") is a homeowner in Nashville, Tennessee. Plaintiff Mendez obtained a mortgage from Defendant Rocket Mortgage, LLC ("Rocket Mortgage") on or about July 2, 2025, for his primary place of residence.

23.     Plaintiff Seth Ogilvie ("Plaintiff Ogilvie") is a homeowner in Nashville, Tennessee and is a current resident of Providence, Rhode Island. Plaintiff Ogilvie obtained a mortgage from Defendant Churchill Mortgage Corporation ("Churchill Mortgage") on or about July 15, 2022, for his primary residence.

7

24.     Plaintiff Ori Wasserburg ("Plaintiff Wasserburg") is a homeowner in Minneapolis, Minnesota. Plaintiff Wasserburg obtained a mortgage from Defendant United Wholesale Mortgage, LLC ("United Wholesale Mortgage") on or about May 23, 2025, for their primary place of residence.

25.     Plaintiff Nancy Donacki-Thompson ("Plaintiff Donacki-Thompson") is a homeowner in Newark, Delaware. Plaintiff Donacki-Thompson obtained a mortgage from Defendant Movement Mortgage, LLC ("Movement Mortgage") on or about August 5, 2022, for her primary place of residence.

**B.     Defendants**

26.     Defendant Optimal Blue, LLC ("Optimal Blue") is a Texas Limited Liability Company, headquartered in Plano, Texas. Optimal Blue is the leading provider of pricing and business analytics software for mortgage originators. Optimal Blue's clients include the nation's largest Loan Originators. Optimal Blue was purchased by Black Knight, Inc. in 2020 and was sold to Constellation, Inc. in 2023.

27.     Defendant Black Knight, Inc. is a Delaware corporation headquartered in Jacksonville, Florida. Black Knight provides software, data, and analytics for mortgages, real estate, and consumer loan markets. Black Knight acquired Optimal Blue in 2020. On information and belief, Black Knight controlled the operations of Optimal Blue, including executive compensation, and considered Optimal Blue and Black Knight to be "one company."[15] In

---

[15]     *See* BLACK KNIGHT, INC., PROXY STATEMENT (APRIL 28, 2022); *see also* Black Knight Inc., *Presents at Stephens Annual Investment Conference*, BAMSEC (Nov. 19, 2020) https://www.bamsec.com/transcripts/6377778d-1f51-440e-9fa7-4dfbf4249abf?hl_id=41b1pwwmgg.

September 2023, Intercontinental Exchange acquired Black Knight, at which time Optimal Blue was sold to Constellation Software, Inc.

28.     Defendant Constellation Software, Inc. ("Constellation") is a Canadian corporation, headquartered in Toronto, Ontario. Constellation acquires, manages, and builds vertical market software businesses. Constellation acquired Optimal Blue from Black Knight, Inc. in 2023 through Constellation's operating group, Perseus. On information and belief, Constellation was aware of Optimal Blue's anticompetitive activities when it acquired Optimal Blue. Constellation acquired Optimal Blue with the intention of maintaining and enhancing those anticompetitive activities, which it continues to do through its control of Optimal Blue and its operations. Immediately following the acquisition, Constellation installed Scott Smith, President of Constellation's Andromeda Group, as interim-CEO of Optimal Blue. When asked about his approach to building versus buying companies, Smith emphasized Constellation's operational role in building Optimal Blue's business, explaining that while Constellation acquires many companies "[a]t Optimal Blue, specifically, we really focus on building and partnering — that's core to our strategy."[16]

29.     Defendant Rocket Mortgage, LLC ("Rocket Mortgage") is a Michigan Limited Liability Company, headquartered in Detroit, Michigan. Rocket Mortgage is involved in the mortgage industry in many capacities, including as a direct-to-consumer broker, a wholesale broker, a correspondent lender, and a servicer. Rocket Mortgage is licensed to originate mortgages in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,

---

[16]     Connie Kim, *Optimal Blue's Scott Smith talks long-term goals, competition in mortgage tech*, HOUSING WIRE (Oct. 20, 2023) https://www.housingwire.com/articles/optimal-blues-scott-smith-talks-long-term-goals-competition-in-mortgage-tech/.

Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Washington, D.C.[17] Between 2019 and 2024, Rocket Mortgage priced 1,096,637 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

30.     Defendant United Wholesale Mortgage, LLC ("United Wholesale Mortgage") is a Michigan Limited Liability Company headquartered in Pontiac, Michigan. United Wholesale Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, United Wholesale Mortgage priced 893,340 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

31.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association chartered and regulated by the Office of the Comptroller of the Currency with its principal place of business in Sioux Falls, South Dakota. Wells Fargo is a nationwide financial services provider that is licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Wells Fargo priced 570,329 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

32.     Defendant JPMorgan Chase Bank, N.A. ("Chase") is a national banking association chartered and regulated by the Office of the Comptroller of the Currency with its principal place of business in Columbus, Ohio. Chase is a nationwide financial services provider that is licensed

---

[17]     Rocket Mortgage lists on its website that borrowers can use it "to get a loan in all 50 states and the District of Columbia." *Rocket Mortgage ® FAQs*, ROCKET MORTG., https://www.rocketmortgage.com/faqs (last visited Oct. 3, 2025).

to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Chase priced 491,177 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

33.     Defendant loanDepot.com, LLC ("loanDepot.com") is a California Limited Liability Company headquartered in Irvine, California. Loandepot.com is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, loanDepot.com priced 379,922 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

34.     Defendant Bank of America, N.A. ("Bank of America") is a national banking association chartered and regulated by the Office of the Comptroller of the Currency with its principal place of business in Charlotte, North Carolina. Bank of America is a nationwide financial services provider that is licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Bank of America priced 360,269 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

35.     Defendant Fairway Independent Mortgage Corporation ("Fairway Independent Mortgage") is a Texas Corporation headquartered in Madison, Wisconsin. Fairway Independent Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Fairway Independent Mortgage priced 265,366 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

36.     Defendant U.S. Bank National Association ("U.S. Bank") is an Ohio Corporation headquartered in Cincinnati, Ohio. U.S. Bank is a nationwide financial services provider that is licensed to originate mortgages in all fifty states, including Tennessee, and the District of

Columbia. Between 2019 and 2024, U.S. Bank priced 263,661 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

37.     Defendant Freedom Mortgage Corporation ("Freedom Mortgage") is a Florida Corporation headquartered in Boca Raton, Florida. Freedom Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Freedom Mortgage priced 261,674 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

38.     Defendant Guaranteed Rate, Inc. ("Guaranteed Rate") is a Delaware company headquartered in Chicago, Illinois. Guaranteed Rate is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Guaranteed Rate priced 236,449 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

39.     Defendant NewRez, LLC ("NewRez") is a Delaware Limited Liability Company headquartered in Fort Washington, Pennsylvania. NewRez is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, NewRez priced 215,829 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

40.     Defendant CrossCountry Mortgage, LLC ("CrossCountry Mortgage") is an Ohio Limited Liability Company headquartered in Cleveland, Ohio. CrossCountry Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, CrossCountry Mortgage priced 213,782 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

41.     Defendant PennyMac Loan Services, LLC ("PennyMac") is a Delaware Limited Liability Company headquartered in Westlake Village, California. PennyMac is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, PennyMac priced 167,956 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

42.     Defendant Guild Mortgage Company, LLC ("Guild Mortgage Company") is a California Limited Liability Company headquartered in San Diego, California. Guild Mortgage Company is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Guild Mortgage Company priced 145,938 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

43.     Defendant Citibank, N.A. ("Citibank") is a national banking association chartered and regulated by the Office of the Comptroller of the Currency with its principal place of business in Sioux Falls, South Dakota. Citibank is a nationwide financial services provider licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Citibank priced 144,291 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

44.     Defendant Flagstar Bank, N.A. ("Flagstar Bank") is a national banking association chartered and regulated by the Office of the Comptroller of the Currency with its principal place of business in Hicksville, New York. Flagstar Bank is a nationwide financial services provider licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Flagstar Bank priced 136,187 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

45.     Defendant Nationstar Mortgage, LLC ("Nationstar Mortgage") is a Texas Limited Liability Company headquartered in Coppell, Texas. Nationstar Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Nationstar Mortgage priced 130,209 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time. Nationstar Mortgage acquired Home Point Capital Inc. in August 2023. Additionally, Nationstar Mortgage sometimes issues loans under the business name "Mr. Cooper." Nationstar Mortgage was acquired by Rocket Mortgage in October 2025.

46.     Defendant New American Funding, LLC ("New American Funding") is a Delaware Limited Liability Company headquartered in Tustin, California. New American Funding is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, New American Funding priced 114,006 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

47.     Defendant CMG Mortgage, Inc. ("CMG Mortgage") is a California Corporation headquartered in San Ramon, California. CMG Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, CMG Mortgage priced 98,544 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

48.     Defendant AmeriSave Mortgage Corporation ("AmeriSave Mortgage") is a Georgia Corporation headquartered in Atlanta, Georgia. AmeriSave Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District

of Columbia. Between 2019 and 2024, AmeriSave Mortgage priced 84,322 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

49.     Defendant Better Mortgage Corporation ("Better Mortgage") is a California Corporation headquartered in New York, New York. Better Mortgage is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Better Mortgage priced 82,492 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

50.     Defendant FirstBank is a Tennessee Corporation headquartered in Nashville, Tennessee. FirstBank is a Loan Originator licensed to originate mortgages in Tennessee, Alabama, Georgia, Kentucky, and North Carolina. Between 2019 and 2024, FirstBank priced 91,084 mortgages, and used Optimal Blue's Business Analytic tools for at least a portion of that time.

51.     Defendant Churchill Mortgage Corporation ("Churchill Mortgage") is a Tennessee Corporation headquartered in Brentwood, Tennessee. Churchill Mortgage is a Loan Originator and servicer licensed to originate mortgages in forty-nine states (all but New York) and the District of Columbia. Between 2019 and 2023, Churchill Mortgage priced 65,610 mortgages and used Optimal Blue's Business Analytic Tools for at least a portion of that time.

52.     Defendant First Community Mortgage, Inc., ("First Community") is a Tennessee Corporation headquartered in Murfreesboro, Tennessee. First Community is a Loan Originator and servicer licensed to originate mortgages in Alabama, Arizona, Arkansas, California, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, North Dakota, Oregon, Rhode Island, Vermont, Washington, West Virginia, Wyoming, and the District of Columbia. Between 2019 and 2024, First Community priced 56,869 mortgages, and used Optimal Blue's Business Analytic Tools for at least a portion of that time.

53. Defendant Movement Mortgage, LLC ("Movement Mortgage") is a South Carolina Corporation headquartered in Indian Land, South Carolina. Movement Mortgage is a is a Loan Originator and servicer licensed to originate mortgages in all fifty states, including Tennessee, and the District of Columbia. Between 2019 and 2024, Movement Mortgage priced 481,923 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

54. Defendant Beeline Loans, Inc. ("Beeline") is a subsidiary of Beeline Financial Holdings, Inc., a Rhode Island Corporation headquartered in Providence, Rhode Island. Beeline is a Loan Originator and servicer licensed to originate mortgages in Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Wisconsin, and the District of Columbia. Between 2020 and 2024, Beeline priced 2,663 mortgages and used Optimal Blue's Business Analytic tools for at least a portion of that time.

55. On information and belief, Loan Originator Defendants continue to use Optimal Blue's Business Analytics tools to originate mortgages. Each Loan Originator Defendant entered into a written contract and paid for Optimal Blue. Each Loan Originator Defendant would not have paid for Optimal Blue's Business Analytics' tools unless: a) doing so enabled it to set Mortgage Prices above a competitive level; and b) it knew its competitors were, likewise, using Optimal Blue to set their Mortgage Prices.

56. Various other persons, firms, and corporations not named as defendants, including Unnamed Co-conspirator Lenders, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, including co-conspirators not named as

defendants in this Complaint. Plaintiffs reserve the right to name any known or unknown co-conspirators as defendants at a later date.

57. Whenever reference is made to any act of any corporation, property trust, LP, LLC, LLP, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

58. Each Defendant named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.   FACTUAL ALLEGATIONS

### A.   The Residential Mortgage Lending Market

59. Residential mortgages form the bedrock of American homeownership and economic stability. For most Americans, their home represents the cornerstone of their financial security and their largest single investment.

60. The overwhelming majority of U.S. homebuyers depend on residential mortgages to purchase their homes. Residential mortgage debt comprises approximately 70% of all U.S. consumer debt. As of the first quarter of 2025, Americans owed $12.8 trillion across 85.78 million residential mortgages.

61. The American residential mortgage system has undergone dramatic transformation over the past century. Early financing options featured short loan terms of 6 to 10 years and restrictive loan-to-value ("LTV") limits. This began changing with two pivotal developments:

(1)the creation of the Federal Housing Administration ("FHA") and (2) the emergence of a robust secondary market for residential mortgages.

62.     When the FHA was founded in 1934, only 1 in 10 Americans could afford to purchase a home through a residential mortgage. The FHA revolutionized homeownership by introducing government-backed loans, extended loan terms, and reduced down payment requirements. Simultaneously, the development of a secondary market—where Loan Originators could sell originated loans to investors—dramatically reduced lending risks and encouraged broader access to credit.

63.     These reforms transformed American home ownership. Today, approximately 65% of Americans own their homes, supported by modern mortgage products that emerged from these foundational changes. The fixed-rate self-amortizing mortgage with down payments as low as 20% was introduced in 1938, followed by adjustable-rate mortgages. Most residential mortgages originated today are self-amortizing with 30- or 15-year terms and either fixed or adjustable interest rates.

### B.     The Secondary Mortgage Market

64.     Mortgage "securitization" transforms individual loans into tradeable securities. This process bundles multiple mortgages together, converts them into mortgage-backed securities ("MBS"), and sells them to investors. An MBS functions as a bond where investor payments derive from the principal and interest payments made on the underlying mortgage pool.

65.     The U.S. MBS market ranks among the world's largest and most actively traded fixed-income markets, with over $11 trillion in outstanding securities and average daily trading volumes approaching $300 billion. These collateralized securities enable a vast investor base to fund American home mortgages.

18

**Figure 1: The Secondary Mortgage Market:**



66.     Approximately 35% of mortgage loans remain on Loan Originators' balance sheets annually. The remaining 65% are packaged and sold on the secondary market shortly after origination. This means most mortgages are not held by the originator lender throughout the loan's lifetime.

67.     A Loan Originator's "gain-on-sale" represents the revenue earned when selling a loan on the secondary market above its recorded value. This typically occurs when the borrower's interest rate generates excess value in the secondary market, which becomes realized income at sale. Accordingly, a Loan Originator's revenue depends primarily on three factors: the loan's secondary market value; the interest rate agreed with the borrower; and the fees received minus costs incurred during origination (including loan officer compensation and servicing fees).

68. Optimal Blue calculates a Loan Originator's margin and profitability using the "primary-secondary spread,"—the difference between mortgage rates charged to borrowers and yields on newly-issued agency MBS.[18]

69. Because most loans enter the secondary market, U.S. residential mortgages have developed standardized structures and contract terms to facilitate securitization. Consequently, residential mortgage contracts for homes in Tennessee are substantially identical to those written elsewhere nationwide.

### C. Loan Originators and Their Loan Officers

70. Loan Originator Defendants include both depository and non-depository lenders. Depository lenders—banks, credit unions, and savings like Wells Fargo and Chase—accept customer deposits wholly or partially to fund mortgages. Non-depository lenders—also called mortgage bankers or independent mortgage companies like Rocket Mortgage—do not accept deposits and instead fund loans through investor capital and/or secondary market sales.

71. Loan officers are individuals who originate loans for either depository or non-depository lenders.

---

[18] Michael Clark, *Market Commentary: The Impact of Low Rates on Lender Profitability*, OPTIMAL BLUE (Jun. 26, 2019), https://engage.optimalblue.com/optimal-insights/market-commentary-the-impact-of-low-rates-on-lender-profitability ("Taking the [primary-secondary] spread and subtracting other components such as the guarantee fee and servicing fee gives some indication, although imperfect, of the profit margins of mortgage originators."). *See also* Nathaniel Drake, *What Determines the Rate on a 30-Year Mortgage?* FANNIE MAE (Dec. 11, 2024) https://www.fanniemae.com/research-and-insights/publications/housing-insights/rate-30-year-mortgage#:~:text=The%20federal%20funds%20rate%20is%20the%20benchmark%20interest%20rate%20for,than%20the%20federal%20funds%20rate (explaining that the "the primary-secondary spread …represents industry origination costs such as servicing fees, guaranty fees, and other lender costs and profits").

### D.  The Loan Origination Process

72.  Loan origination involves several sequential stages: pre-approval; application; processing and underwriting; approval and closing disclosures; and closing.

73.  The process typically begins when borrowers submit pre-approval applications to Loan Originators. Pre-approval letters are not firm lending commitments but estimate the amount, interest rate, term, and conditions the originator would offer, assuming all underwriting requirements are subsequently met. Pre-approval letters are typically required to enter a property purchase contract with financing contingencies. Borrowers frequently seek pre-approval from multiple lenders to compare financing terms.

74.  After identifying specific properties, borrowers complete full mortgage applications with Loan Originators. Most use the standardized Uniform Residential Loan Application. Applications typically include detailed information about the borrower's income, assets, debts, and creditworthiness, the property, occupancy status, loan amount, and whether the transaction involves refinancing or new purchase.

75.  As required by the Truth in Lending Act ("TILA"), Loan Originators must provide borrowers with loan estimates within three business days of receiving applications. These estimates outline proposed loan terms and estimated costs,[19] typically remain valid for ten days, and generally cap closing costs increases at 10% after issuance. A sample loan estimate appears below as Figure 2 at ¶78. Loan Originators are required to provide these estimates to allow borrowers to compare offers.

---

[19]  15 U.S.C. §§1601-1667f.

76.     Next, applications undergo processing and underwriting where borrowers and properties are thoroughly vetted. Loan Originators typically conduct multiple credit checks to confirm creditworthiness and perform title searches[20] to ensure clear property title.[21]

77.     Upon loan approval by the underwriters, Loan Originators provide borrowers with clearance to close and issue the closing disclosures outlining the final loan terms and costs. Like loan estimates, closing disclosures are mandated by TILA.[22] Closing disclosures resemble loan estimates but contain final rather than estimated figures.

78.     Closing represents the final origination stage. Borrowers sign the property deeds and related documents (e.g., promissory notes, mortgages, or deed of trusts), pay applicable closing costs (e.g., origination fees, title insurance, taxes), and receive official loan funding.

### E.     Mortgage Pricing

79.     The total borrower cost of a mortgage is established at origination. As reflected on standard loan estimates and closing disclosures, total mortgage costs consist of: "loan amount" + "interest" + "loan costs" (including application fees, underwriting fees, points)[23] + "other costs" (like taxes, recording fees, and title fees).

---

[20]     "Title search" refers to the process by which a loan originator examines public records to ensure there are no claims, liens, or issues, with the property that could result in another entity staking a claim to the property.

[21]     "Clear title" refers to the title of a parcel of real estate free from any type of lien or levy that would pose a question as to the legal ownership of that property.

[22]     15 U.S.C. §§1601-1667f.

[23]     The loan's interest rate and certain loan costs together are often referred to as the Annual Percentage Rate or "APR." APR is one measure of the cost of credit born by the borrower and is expressed as a nominal yearly rate based on the amount and timing of payments made by the borrower. Loan originators calculate their APR figures in slightly different ways. For example, some exclude application and underwriting fees in their APR calculation, while others do not.

80.     Thirty-year mortgage interest rates typically move in response to changes in 10-year Treasury Note.[24] In a competitive market, Loan Originators determine mortgage interest rates by adding a spread to the benchmark 10-year Treasury Note. Loan Originators use the 10-year rather than 30-year Treasury Notes because the effective life of 30-year fixed-rate mortgages averages 7–10 years. The 10-year Treasury Note represents the closest risk-free alternative with similar maturity. This spread typically is considered to comprise of the primary-secondary spread (discussed above) and the "secondary spread," which "represents the additional risk that investors take on when investing in an MBS relative to investing in a 10-year Treasury."[25]

81.     In a competitive market, Loan Originators also consider borrower characteristics (e.g., credit rating), loan features (e.g., amount, LTV, term, fixed vs adjustable interest rates), and property characteristics when setting interest rates for applicants.

82.     Loan costs and other costs, shown on page 2 of the Loan Estimate in Figure 2 below, constitutes the borrower's "total closing cost," "—the upfront costs required to close the loan. As Figure 2 demonstrates, closing costs include, among other costs, origination and lender fees,[26] discount points[27] and lender credits,[28] third-party costs, and government fees and taxes.

---

[24]    Drake, *supra* note 18. (The 10-year Treasury Note's rate "is determined by investors' expectations for shorter-term interest rates in the economy…," which are in turn influenced by expectations around national policy, economic growth, and inflation).

[25]    *Id*.

[26]    Origination charges are items the consumer will pay to each creditor and loan originator for originating and extending credit. (§ 1026.37(f)(1))

[27]    Discount points are a one-time fee paid at closing to a lender in exchange for a lower interest rate. Paying one discount point is the equivalent of paying a fee of one percent of the loan amount, but discount points have no fixed value in terms of the change in interest rate.

[28]    Lender credits are the amount of any payments from the creditor to the consumer and is disclosed as a negative number. Lender Credits include specific lender credits (if any) that pay for a particular fee disclosed on the Loan Estimate and general or non-specific lender credits (if any) that do not pay for a particular fee on the Loan Estimate. (Comment 37(g)(6)(ii)-1)

83. A sample Loan Estimate for a fixed-rate self-amortizing 30-year mortgage with 0.25 discount points and no lender credits appears below in Figure 2.

**Figure 2: Sample Loan Estimate:[29]**

[29] *Loan Estimate Explainer*, CONSUMER FINANCIAL PROTECTION BUREAU, https://www.consumerfinance.gov/owning-a-home/loan-estimate/ (last visited Oct. 3, 2025).

## Closing Cost Details

### Loan Costs

| A. Origination Charges | $1,802 |
|---|---|
| .25 % of Loan Amount (Points) | $405 |
| Application Fee | $300 |
| Underwriting Fee | $1,097 |

| B. Services You Cannot Shop For | $672 |
|---|---|
| Appraisal Fee | $405 |
| Credit Report Fee | $30 |
| Flood Determination Fee | $20 |
| Flood Monitoring Fee | $32 |
| Tax Monitoring Fee | $75 |
| Tax Status Research Fee | $110 |

| C. Services You Can Shop For | $3,198 |
|---|---|
| Pest Inspection Fee | $135 |
| Survey Fee | $65 |
| Title – Insurance Binder | $700 |
| Title – Lender's Title Policy | $535 |
| Title – Settlement Agent Fee | $502 |
| Title – Title Search | $1,261 |

| D. TOTAL LOAN COSTS (A + B + C) | $5,672 |
|---|---|

### Other Costs

| E. Taxes and Other Government Fees | $85 |
|---|---|
| Recording Fees and Other Taxes | $85 |
| Transfer Taxes | |

| F. Prepaids | $867 |
|---|---|
| Homeowner's Insurance Premium ( 6  months) | $605 |
| Mortgage Insurance Premium (    months) | |
| Prepaid Interest ( $17.44 per day for 15 days @ 3.875%) | $262 |
| Property Taxes (    months) | |

| G. Initial Escrow Payment at Closing | | $413 |
|---|---|---|
| Homeowner's Insurance $100.83 per month for 2 mo. | | $202 |
| Mortgage Insurance | per month for    mo. | |
| Property Taxes | $105.30 per month for 2 mo. | $211 |

| H. Other | $1,017 |
|---|---|
| Title – Owner's Title Policy (optional) | $1,017 |

| I. TOTAL OTHER COSTS (E + F + G + H) | $2,382 |
|---|---|

| J. TOTAL CLOSING COSTS | $8,054 |
|---|---|
| D + I | $8,054 |
| Lender Credits | |

### Calculating Cash to Close

| Total Closing Costs (J) | $8,054 |
|---|---|
| Closing Costs Financed (Paid from your Loan Amount) | $0 |
| Down Payment/Funds from Borrower | $18,000 |
| Deposit | – $10,000 |
| Funds for Borrower | $0 |
| Seller Credits | $0 |
| Adjustments and Other Credits | $0 |
| **Estimated Cash to Close** | $16,054 |

## Additional Information About This Loan

| | | | |
|---|---|---|---|
| **LENDER** | Ficus Bank | **MORTGAGE BROKER** | |
| **NMLS/__ LICENSE ID** | | **NMLS/__ LICENSE ID** | |
| **LOAN OFFICER** | Joe Smith | **LOAN OFFICER** | |
| **NMLS/__ LICENSE ID** | 12345 | **NMLS/__ LICENSE ID** | |
| **EMAIL** | joesmith@ficusbank.com | **EMAIL** | |
| **PHONE** | 123-456-7890 | **PHONE** | |

| **Comparisons** | Use these measures to compare this loan with other loans. | |
|---|---|---|
| **In 5 Years** | $56,582 | Total you will have paid in principal, interest, mortgage insurance, and loan costs. |
| | $15,773 | Principal you will have paid off. |
| **Annual Percentage Rate (APR)** | 4.274% | Your costs over the loan term expressed as a rate. This is not your interest rate. |
| **Total Interest Percentage (TIP)** | 69.45% | The total amount of interest that you will pay over the loan term as a percentage of your loan amount. |

| **Other Considerations** | |
|---|---|
| **Appraisal** | We may order an appraisal to determine the property's value and charge you for this appraisal. We will promptly give you a copy of any appraisal, even if your loan does not close. You can pay for an additional appraisal for your own use at your own cost. |
| **Assumption** | If you sell or transfer this property to another person, we<br>☐ will allow, under certain conditions, this person to assume this loan on the original terms.<br>☒ will not allow assumption of this loan on the original terms. |
| **Homeowner's Insurance** | This loan requires homeowner's insurance on the property, which you may obtain from a company of your choice that we find acceptable. |
| **Late Payment** | If your payment is more than 15 days late, we will charge a late fee of 5% of the monthly principal and interest payment. |
| **Refinance** | Refinancing this loan will depend on your future financial situation, the property value, and market conditions. You may not be able to refinance this loan. |
| **Servicing** | We intend<br>☐ to service your loan. If so, you will make your payments to us.<br>☒ to transfer servicing of your loan. |

| **Confirm Receipt** |
|---|

By signing, you are only confirming that you have received this form. You do not have to accept this loan because you have signed or received this form.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Applicant Signature | Date | Co-Applicant Signature | Date |

### F. Optimal Blue's Mortgage Pricing Solutions

84. The residential loan origination process was ripe for automation. Until the early-to-mid-2000s, Loan Originators relied on daily price sheets to calculate par rates (the mortgage interest rates at zero points) using complex matrices that reflected risk assessment data collected during borrower applications.

85. The development of the modern Product and Pricing Engines ("PPE") revolutionized this antiquated system. PPE software automates mortgage pricing for Loan Originators by distributing price sheets electronically. These systems identify interest rates for Loan Originators through real-time pricing feeds from the secondary market and apply Loan Originators' specified pricing overlays based on borrower and property characteristics gathered during origination.

86. Optimal Blue operates the dominant PPE in the United States, controlling 68% of the top 500 mortgage lenders in the country. Optimal Blue's PPE prices approximately 40% of all residential mortgages annually and serves roughly 3,500 lenders. Of all mortgages originated by the top 20 mortgage lenders nationally in 2024, 82% used Optimal Blue's systems.

**Figure 3: Optimal Blue Loan Amount Share Among Top 20 Lenders**:



87.     Optimal Blue's dominance begins at the origination process's inception. When Loan Originators input the borrower, property, and loan variables from mortgage applications into the PPE's loan search page, they surrender competitively sensitive information about prospective borrowers and desired loan characteristics to Optimal Blue —and consequently to competing Loan Originators. This data sharing occurs because Optimal Blue uses information from all participating lenders to generate pricing recommendations, effectively pooling competitive intelligence across the entire network. Figure 4 shows the loan search page of Optimal Blue's PPE as of 2017:

**Figure 4: Optimal Blue's PPE loan search page as of [2017]:**



88.     When Loan Originators submit loan searches, the PPE evaluates the loan scenario using data collected not only from the searching originator but from all competing Loan Originators in the system. The system then returns eligible loan products for borrowers based on this comprehensive competitive dataset. Loan search appears below in Figure 5.

**Figure 5: Optimal Blue's Eligible Loan Products Search Results Example as of 2017**

| | Print | Full Product Listing... | Top Products by Type... | Top Products (Origin... | Side-by-Side Compari... | Blended Comparison (... ▼ | Best Pricing (Origin... |

Search Timestamp: 10/01/14 10:47 AM

The pricing displayed below is based on a 30 day lock period. To see pricing for a different lock period, please fill in the "Desired Lock" in the Resubmit Options above and click Re-Submit.

| Rate | Product | APR | APOR | P&I | Closing Cost ($) | Origination Charges($) | 3rd Party Fees($) | MI | Discount/Rebate($/%) | Price | QM | QM Trace | Compensation($) | Select |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.875 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.137 | 4.24% | $964 | $6,389 | $6,359 | $30 | MI | 1.608% ($3296) | 98.392 | ✓ | QM | $1,435 | ☐ |
| 3.950 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.164 | 4.24% | $973 | $5,208 | $5,178 | $30 | MI | 1.032% ($2116) | 98.968 | ✓ | QM | $1,435 | ☐ |
| 4.000 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.186 | 4.24% | $979 | $4,534 | $4,504 | $30 | MI | 0.703% ($1441) | 99.297 | ✓ | QM | $1,435 | ☐ |
| 4.125 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.252 | 4.24% | $994 | $3,092 | $3,062 | $30 | MI | 0.000% (-$0) | 100.000 | ✓ | QM | $1,435 | ☐ |
| 4.250 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.284 | 4.24% | $1008 | $829 | $799 | $30 | MI | -1.104% (-$2263) | 101.104 | ✓ | QM | $1,435 | ☐ |
| 4.375 | US Bank National Correspondent - Conforming FHLMC 30 Yr Fixed (3601) | 4.375 | 4.24% | $1024 | $0 | $0 | $0 | MI | -1.645% (-$3372) | 101.645 | ✓ | QM | $1,435 | ☐ |

89.     After Loan Originators provide loan estimates to prospective borrowers and borrowers accept terms, originators use their PPE to request rate locks from their organization's system administrators who oversee pricing strategy. This pricing strategy incorporates competitively sensitive information harvested from rival lenders throughout the network. The rate lock request button appears in the top right corner of Figure 6 below.

**Figure 6: Requesting a Rate Lock Through the Optimal Blue's PPE as of 2017:**



90. As Optimal Blue's CEO Scott Happ characterized the system's power: "We built a tool to help originators visualize information—it really democratizes data! The Optimal Blue solution is available to anyone that wants a better understanding of what is happening within their operation."[30] This "democratization" effectively means competitors gain unprecedented access to each other's most sensitive pricing and business intelligence.

---

[30] Optimal Blue, *Optimal Blue doubles down on data*, HOUSING WIRE (Feb. 26, 2018) https://www.housingwire.com/articles/42609-optimal-blue-doubles-down-on-data/.

## V. LOAN ORIGINATOR DEFENDANTS CONSPIRE TO EXCHANGE COMPETITIVELY SENSITIVE INFORMATION THROUGH OPTIMAL BLUE'S BUSINESS ANALYTICS TOOLS AND ARTIFICIALLY INFLATE MORTGAGE PRICES

### A. Optimal Blue's Competitive Analytics and Competitive Data License Tools

91.     Optimal Blue promises Loan Originator Defendants unprecedented insight into competitors' costs, prices, and profit margins, powered by granular loan-level data reflecting over $1.1 trillion in annual loan volume processed through Optimal Blue's PPE. CEO Happ has declared that Optimal Blue is "uniquely positioned to provide data driven insights. That has a lot to do with our scale, as we are the largest industry marketplace of this type by a fair stretch."[31]

92.     Through its Business Analytics Tools, Optimal Blue operates as the central hub for Loan Originator Defendants' exchange of competitively sensitive, granular, non-public pricing data, enabling real-time coordination of residential mortgage pricing and facilitating prices agreement. As Optimal brags on its website: "As the technology platform supporting over 35% of all mortgage rate locks in the country, Optimal Blue sits atop a sea of mortgage data that is extremely unique, explicitly granular, and highly predictive with critical industry outcomes such as home prices, rate trends, and volumes."[32]

93.     Optimal Blue's Business Analytics Tools centralize mortgage transactions and pricing data and eliminate the competitive uncertainty that normally constrains coordination among rivals. Through these tools, each Loan Originator can monitor precisely where it holds the narrowest or widest pricing margins, how positioning influences market share, and how competitors set rates across loan products and regions. This shared intelligence allows Loan

---

[31]     Optimal Blue, *supra* note 30.

[32]     *Market Analytics*, OPTIMAL BLUE, https://www2.optimalblue.com/market-analytics (last visited Oct. 2, 2025).

Originators to calibrate pricing strategies based on competitors' actions, stabilizing margins, and neutralizing price competition.

94. The conspiracy operates through real-time intelligence sharing. Optimal Blue's Competitive Analytics tool displays competitors' live margins and concessions. When Loan Originators discover they are pricing below rivals, they raise margins without risking market share loss. Borrowers then face inflated rates and fees than they would in a genuinely competitive market. Because lenders monitor competitors' prices in near real-time, downward pricing pressure evaporates. The result is systematically higher and more uniform Mortgage Prices achieved through coordinated behavior rather than independent competition.

95. Before Optimal Blue's Business Analytics Tools, Loan Originators relied on annual Home Mortgage Disclosure Act ("HMDA") reporting or stale, incomplete, and aggregated survey data to understand competitive positioning. Optimal Blue's Insight tool, introduced in 2014, "enable[d] lenders to compare their retail pricing against the rest of the market for all loan types and loan scenarios."[33] By "provid[ing] actual consumer facing prices—not survey responses," this tool enabled lenders to "optimize[e] volume and profitability."[34]

96. The 2019 introduction of Optimal Blue's Competitive Analytics marked the conspiracy's acceleration. This tool provides users with granular pricing data and post-rate lock intelligence at narrow geographic parameters in real-time, fundamentally transforming the competitive data available to Loan Originators.

---

[33] Brena Swanson, *Optimal Blue launches market pricing analysis mortage solutions*, HOUSING WIRE (Nov. 4, 2019), https://www.housingwire.com/articles/31939-optimal-blue-launches-market-pricing-analysis-mortgage-solution/.

[34] *Id.*

97.　　Announcing Competitive Analytics in 2019, CEO Happ proclaimed, "Competitive Analytics is the only product available to lenders that provides such an extraordinary level of market transparency and sophisticated business intelligence."[35]This tool enables Loan Originator Defendants to monitor, in real time, their competitors' interest rates, fees, and costs (e.g. loan officer compensation) in specific locations, and adjust their own pricing in response. Optimal Blue reported that it has "customers that are running hundreds of *geo-specific* searches every day to get a quick handle on how they should *adjust pricing*. It's a very dynamic marketplace and our tools provide real time information at the loan scenario level."[36]

98.　　In a competitive mortgage market, Loan Originators independently set rates and margins, experimenting with lower prices or innovative products to capture market share. Competitive uncertainty acts as the invisible hand, disciplining, forcing them to undercut rivals, compress margins, and pass benefits to borrowers through lower costs. Optimal Blue's Business Analytics Tools replace this invisible hand with a visible one, providing users with coordinated insight into rivals' pricing and margins, which allows lockstep movement rather than competition, leaving borrowers facing inflated costs and diminished competitive options.

99.　　Defendant Beeline Loans recently boasted about how its use of Optimal Blue allowed it to nearly double its margins without fear of competition from rivals:

> "*Prior to partnering with Optimal Blue, it felt like we were working in a black box, with limited visibility into the bigger picture. We were leaving so much money on the table . . . .Now, we can raise margins where it makes sense or get really*

---

[35]　　Sarah Wheeler, *Want to know how your mortage company ranks against the competition*, HOUSING WIRE (Aug. 28, 2019) https://www.housingwire.com/articles/49961-want-to-know-how-your-mortgage-company-ranks-against-the-competition/.

[36]　　Optimal Blue, *Optimal Blue doubles down on data,* HOUSING WIRE (Feb. 26, 2018), https://www.housingwire.com/articles/42609-optimal-blue-doubles-down-on-data/.

*competitive in specific MSAs without tightening everywhere. **We were able to nearly double our margins from 1.78% in November 2024 to 3% in July 2025**.*"[37]

100.     Optimal Blue fundamentally alters competitive dynamics by centralizing and redistributing detailed pricing and transaction data in real-time, it removes the uncertainty about rivals' positions. Each Loan Originator can monitor, in real time, how competitors set rates, how margins compare, and where market share shifts. Armed with this intelligence, Loan Originators abandon guesswork and move in lockstep because they possess complete knowledge of peers' pricing strategies and can adjust accordingly. Loan Originators using Optimal Blue's tools join a price-fixing club, ensuring elevated prices across the conspiracy's membership.

101.     The competitive intelligence available to Loan Originator Defendants flows directly from fellow users. As a 2019 Housing Wire article addressing the launch of Competitive Analytics explained, "Optimal Blue's market share is what makes this competitive analysis possible. As the largest provider of secondary marketing automation to the mortgage industry, Optimal Blue floats on a sea of operational and transactional data."[38]

102.     In June 2024, Optimal Blue released its Competitive Data License as an automatic upgrade to Optimal Blue's PPE and Competitive Analytics users. This "more robust […] data set" ***goes a step further than the Competitive Analytics tool in providing Loan Originators and other***

---

[37]     *Beeline Loans nearly doubles margins in just eight months with Optimal Blue*, OPTIMAL BLUE, https://engage.optimalblue.com/hubfs/Case%20Studies/Case%20Study_Beeline%20Loans-WEB.pdf (last visited October 3, 2025).

[38]     Wheeler, *supra* note 35.

*users information about their peers' "loan-level price adjustments (LLPA), servicing related premiums (SRP), concessions, loan officer compensation, base price, and par rate."*[39]

### B. The Competitively Sensitive Information Available Through Competitive Analytics Tool

103.    In September 2020, Optimal Blue demonstrated the Competitive Analytics tool's granular capabilities for viewing peers' volume, pricing, and margin information. The demonstration featured three tools:

    a.    **Volume Benchmarking**: Percental Ranking tools (the "Volume Benchmarking Tools");

    b.    **Pricing Strategies**: Rate & Price Comparison tools ("Rate & Price Comparison Tools"); and

    c.    **Pricing Strategies**: Margins & Concessions tools ("Margins & Concessions Tools").

### 1.    Volume Benchmarking

104.    The Volume Benchmarking Tools rank Loan Originators peers by volume, gross profit, and average loan amount at national, state, or Metropolitan Statistical Area (MSA) levels. Loan Originators can filter visualizations by LTV, borrower FICO range (i.e. credit score), loan type, loan term, and occupancy status, among other factors. This functionality enables Loan Originators to identify adjustments needed to maintain specific rankings or percentile ranges. For example, a Loan Originator in an MSA with 100 competitors can monitor the volume, gross profit, and average loan amount of the top 20 competitors daily. More troubling, this tool displays metrics

---

[39]    *Optimal Blue Launches Competitive Data License to Help Lenders Optimize margins With Competitive Loan Pricing Data*, OPTIMAL BLUE (June 25, 2024), https://www2.optimalblue.com/optimal-blue-competitive-data-license. (emphasis added).

for specific loan types and credit score ranges—loan officers can see the average loan amounts for 30-year fixed rate mortgages for subprime borrowers in their MSA on any given day, or borrowers with a particular credit score.

**Figure 7: Competitive Analytics: Volume Benchmarking—Percentile Rankings September 2020 Demonstration**



**Figure 8: Competitive Analytics: Volume Benchmarking—Percentile Rankings**



## 2. Rate & Price Comparison Tools

105. Optimal Blue's impact extends beyond volume sharing to direct price coordination. Optimal Blue explicitly acknowledges the price impact it and its customers expect to achieve through its tools. For example, Optimal Blue sales specialist Melanie Simmer explained that if a Loan Originator wants to rank in the top 20% of 665 lenders in a particular MSA, they can observe the cost, price, and margin metrics of lenders ranked in that percental and replicate those pricing strategies.

106. Loan Originators accomplish this through Optimal Blue's Rate & Price Comparison Tools, which display their own Mortgage Prices alongside competitors', filtered by geographic region, time period, loan type, loan term, and borrower credit score.

107. Loan Originator Defendants use these tools to coordinate Mortgage Pricing. Loan Originators can view Mortgage Pricing components for specific loan types in particular areas, on given days, for borrowers with specific credit scores, displayed by percentiles or averages. During Optimal Blue's 2020 demonstration, the company stated: "this is all about identifying where you want to be […] and be able to tweak your margins to be where you want to be." In essence, Loan Originator Defendants use Optimal Blue tools to maximize their margins rather than compete for borrowers through competitive pricing.

**Figure 9: Competitive Analytics: Pricing Strategies—Rate and Price Comparison September 2020 Demonstration**



### 3. Margins & Concessions Tools

108.     Optimal Blue's Margins & Concessions Tools chart Loan Originators' profit margins as compared to competitors. Loan Originators can monitor "how much they are giving back in concessions" compared to selected competitors in identical loan scenarios. These tools enable county-level filtering, allowing Loan Originators to price mortgages with full knowledge what their competitors are charging in their own county.

39

**Figure 10: Competitive Analytics: Pricing Strategies—Margin and Concessions**



109.    Optimal Blue's public statements illustrate that its Business Analytics Tools systematically reduce competition among Loan Originators and inflate mortgage costs for borrowers by: (1) emboldening originators to resist price competition; (2) reducing concession frequency; (3) reinforcing pricing discipline; and (4) diminishing borrower leverage.

110.    In a June 2024 webinar, Optimal Blue executives explicitly acknowledged reduced price competition and consumer leverage resulting from widespread Business Analytics Tools usage among Loan Originators. The webinar revealed that Loan Originators monitor peer group's daily business decisions across metrics like concessions, points, and loan officer commissions, compared to their own performance. Loan Originators can confidently avoid squandering the opportunity to raise Mortgage Prices or maintain or reduce their concession rate or loan officer commission rate.

111. For example, Loan Originators use Optimal Blue's Business Analytics Tools to identify when their pricing for specific loan types falls below competitors at given times. With this information, Loan Originators Defendants adjust their pricing upward to match their higher pricing peers, extracting additional margin from borrowers.

112. Optimal Blue acknowledges that when originators "enter negotiations with a borrower who is pushing for a price exception, having a clear view into actual market rates and production can help [Loan Originators] avoid unnecessary giveaways" and "concession reduction can also be improved by giving loan officers actionable data about their target markets."

113. While Optimal Blue portrays these tools as empowering Loan Originators to respond to market changes, the actual effect eliminates price competition for borrowers.

## VI. DEFENDANTS' INFORMATION EXCHANGE INDEPENDENTLY VIOLATES THE SHERMAN ACT

114. Optimal Blue's power derives from the comprehensive scope of user-provided loan transaction data. Users, including Loan Originator Defendants, pay substantial fees and surrender proprietary data in exchange for access to competitors' information and Optimal Blue's analytical insights. As Optimal Blue acknowledges, "with each additional user, the power of our network grows."

115. Optimal Blue's Licensing and Use Disclosure reveals the sweeping data license required for participation. The disclosure mandates that Loan Originators grant Optimal Blue a "perpetual, royalty free, fully paid, non-exclusive license to use, modify, promote, display, distribute, sublicense or create derivative works of any data and information (including loan applicant information) provided to Optimal Blue by Customer." Each Loan Originator Defendant permitted Optimal Blue to exploit their proprietary pricing, cost, margin, and loan data as software

inputs understanding this information would generate granular price, margin and cost comparisons accessible to competitors.

116. Although Loan Originator Defendants ostensibly compete to sell mortgages in the United States; their agreement to exchange competitively sensitive business information through Optimal Blue has systematically eliminated competition in the residential mortgage industry.

**A.** **The Information Exchange Conspiracy**

117. Optimal Blue enabled Loan Originator Defendants to participate in sharing competitively sensitive business information—including recent, current, and future Mortgage Pricing data—and each Loan Originator Defendant accepted this invitation. Each Loan Originator Defendant knew competitors received identical invitations. Each Loan Originator Defendant subscribed to Optimal Blue's services.

118. Competition suffers when competitors with market power in concentrated markets, such as the market at issue here, exchange strategic business information about pricing plans. The information exchanged among Defendants was competitively sensitive and materially influenced mortgage sales to customers.

119. Defendants' information exchange occurred in non-public settings and involved confidential, proprietary information unavailable through public sources.

120. Given the residential mortgage industry's characteristics (described below in paragraphs (138-155), Optimal Blue's information exchange is highly likely to produce anticompetitive effects.

121. Defendants' unlawful information exchanges through Optimal Blue were not reasonably necessary to advance any procompetitive purpose.

**B. The Failed Antitrust "Safety Zone" Test**

122. In 1996, the FTC and DOJ published "Statements of Antitrust Enforcement Policy in Health Care" (the "1996 Policy").[40] The 1996 Policy gave guidance to the health care industry on various antitrust issues, including information sharing, and this has since been applied to industries outside of healthcare. The 1996 Policy established an "antitrust safety zone" for information exchanges. Exchanges within the safety zone were unlikely to raise antitrust concerns or face agency challenges.

123. To qualify for safety zone protection information exchanges must satisfy three requirements:

    a. **Third Party management:** The exchange must be managed by a neutral third party, such as a trade association or government agency.

    b. **Aged Information**: Participant must provide relatively old information (more than three months old).

    c. **Aggregated data**: Information must be aggregated to protect source identity with sufficient aggregation preventing competitors from linking data to individual sources.

124. The agencies designed this policy "to ensure that an exchange of price or cost data is not used by competing providers for discussion or coordination of provider prices or costs."[41] The agencies emphasized that "providers [were] aware of the potential antitrust consequences of

---

[40] *Statements of Antitrust Enforcement Policy in Health Care*, F.T.C. (AUGUST 1996) https://www.ftc.gov/system/files/attachments/competition-policy-guidance/statements_of_antitrust_enforcement_policy_in_health_care_august_1996.pdf.

[41] Michael Bloom, *Information exchange: be reasonable*, F.T.C. (December 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable.

information exchanges among competitors," crafting conditions to balance competitors' interests in useful information "against the risk that the exchange of such information may permit [competitors] to communicate with each other regarding a mutually acceptable level of prices."

125.     The agencies withdrew these guidelines in 2023, determining they were "overly permissive on … information sharing." Until withdrawal, this safety zone served as a general legality benchmark for information exchanges across industries.[42]

126.     Defendants fail even this "overly permissive" test for information legality.

a.     **First,** the information exchange is not operated by a neutral third party. Defendant Optimal Blue operates the exchange while maintaining vested interests in Loan Originators' illegal information sharing because it profits directly from resultant user retention and growth. Loan Originators would not pay for products that fail to increase lending margins. Moreover, Optimal Blue has repeatedly acknowledged that software effectiveness grows with expanding user bases.

b.     **Second,** Optimal Blue's information is neither old nor stale. Optimal Blue's marketing materials and public statements emphasize gathering current data from millions of residential mortgage transactions daily and disseminating information immediately to Loan Originators.

c.     **Third**, Optimal Blue's information is filterable such that users can feasibly deanonymize competitively sensitive pricing and margin information. For example, on information and belief, Loan Originators could identify competitors using public closed mortgage information, including volume and geographic location data.

---

[42]     Bloom, *supra* note 41. (when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws.").

127. Following the policy withdrawal Deputy Assistant Attorney General Michael Kades commented on DOJ's new information sharing position at a March 2023 conference. Responding to questions about proper information sharing without safe harbors, Kades emphasized that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, that should send red sirens off.'" Those sirens sound clearly here.

## VII. ECONOMIC EVIDENCE DEMONSTRATES OPTIMAL BLUE INFLATED MORTGAGE PRICING

### A. Optimal Blue Elevated Users' Rate Spreads Above Other Lenders

128. To isolate Loan Originator Defendants' Optimal Blue usage effects on Mortgage Pricing, Plaintiffs compared average rate spreads between Optimal Blue users and non-users, utilizing Home Mortgage Disclosure Act (HMDA) loan data.[43] Rate spread represents the difference between a specific loan's APR and the average prime offer rate ("APOR"), providing one means of estimating Loan Originator markup. The Consumer Financial Protection Bureau calculates APORs as "annual percentage rates derived from average interest rates, points, and other loan pricing terms currently offered to consumers by a representative sample of creditors for mortgage loans that have low-risk pricing characteristics" (i.e., the pricing offered to "prime" borrowers).[44]

---

[43] HDMA requires covered financial institutions to report certain information about their mortgage lending activities on an annual basis, with some delay. It does not require real-time reporting, and HDMA data is not a substitute for Optimal Blue's services.

[44] *CFPB Announces Revised Methodology for Determining Average Prime Offer Rates*, CONSUMER FINANCIAL PROTECTION BUREAU (Apr. 14, 2023), https://www.consumerfinance.gov/about-us/newsroom/cfpb-announces-revised-methodology-for-determining-average-prime-offer-rates/.

129.     To ensure accurate comparison and exclude potential noise, Plaintiffs limited analysis to prime, conventional[45] mortgage loans originated within the top 20 MSAs by 2019 loan count.[46]

130.     Before 2019, Optimal Blue users' rate spreads averaged approximately 4.52 basis points (22.9%) **lower** than other lenders, on average. Prior to Business Analytics Tools launch, Loan Originator Defendants offered superior mortgage pricing compared to competitors.

131.     This relationship persisted in 2019, when Optimal Blue launched Business Analytics Tools, and Loan Originators gradually adopted features.

132.     **However, from January 2020 to December 2024,** rate spreads for Optimal Blue users were approximately 2.68 basis points (49.2%) **above** other lenders' rate spreads.

**B.     Optimal Blue Systematically Raised Users' Mortgage Pricing**

133.     To further estimate Optimal Blue's impact on user mortgage pricing, Plaintiffs conducted preliminary regression analysis using HMDA data on prime, conventional mortgage loans originated between 2018 and 2024. To mitigate potential bias from HMDA composition

---

[45]     The HMDA sample used to for the analysis was restricted to originated, conventional first-lien, owner-occupied, site-built single-family (1-4 unit) mortgages that are not reverse mortgages or for business/commercial purposes, with loan amounts of at least $100,000, loan-to-value ratios of 80% or less, debt-to-income ratios of 36% or less, discount points $\leq 750$ basis points or less, and lender credits $\leq \$1,000$. To remove potentially erroneous reporting values, Plaintiff excluded the top and bottom 0.5% of the rate spread distribution, retaining the middle 99% of observations.

[46]     These MSAs are: Los Angeles-Long Beach-Anaheim, CA; New York-Newark-Jersey City, NY-NJ-PA; Phoenix-Mesa-Scottsdale, AZ; Atlanta-Sandy Springs-Roswell, GA; Dallas-Fort Worth-Arlington, TX; Washington-Arlington-Alexandria, DC-VA-MD-WV; Denver-Aurora-Lakewood, CO; Seattle-Tacoma-Bellevue, WA; Philadelphia-Camden-Wilmington, PA-NJ-DE-MD; Boston-Cambridge-Newton, MA-NH; Riverside-San Bernardino-Ontario, CA; San Francisco-Oakland-Hayward, CA; Houston-The Woodlands-Sugar Land, TX; Minneapolis-St. Paul-Bloomington, MN-WI; Detroit-Warren-Dearborn, MI; Miami-Fort Lauderdale-West Palm Beach, FL; San Diego-Carlsbad, CA; Tampa-St. Petersburg-Clearwater, FL; Portland-Vancouver-Hillsboro, OR-WA; and Charlotte-Concord-Gastonia, NC-SC.

changes over time, Plaintiffs' limited regression to loans originated by lenders present in HMDA data for each year from 2018 through 2024.[47] This yielded over 1.5 million observations.

134.    Regression results demonstrate that after controlling for lender characteristics, loan features,[48] and pandemic-year (2020-2021) effects, Optimal Blue Loan Originators exhibited systematically higher Mortgage Pricing. Specifically, following 2019, Loan Originators using Optimal Blue charged approximately 5 basis points higher rate spreads relative to non-Optimal Blue lenders. This effect is statistically significant at the 1% confidence level.

135.    Moreover, after 2019, Optimal Blue Loan Originators charged on average approximately 9.6 basis points higher rate spreads compared to their own pre-2019 baseline, a statistically significant increase. This translates into additional borrowing costs of approximately $153 per year on average loan sizes of $324,224, or roughly $1,071 in excess interest payments over typical seven-year mortgage lifecycles.[49]

136.    These preliminary results represent conservative estimates of the harm caused by Optimal Blue, as the analysis is limited to prime loans (low-risk, standardized profiles). Additionally, while rate spread reasonably proxies Loan Originators' gross margins, it is not the only channel through which Optimal Blue enables Loan Originators to increase Mortgage Pricing (e.g., fees, concessions).

---

[47]    Lenders are assigned a specific Legal Entity Identifier (LEI) in the HDMA data. A lender may stop reporting loan origination under a LEI for various reasons, including mergers and acquisitions, bankruptcy, or exits from the mortgage market.

[48]    Loan-to-Value (LTV) ratios are categorized as: below 60%, 60-70%, and 70-80%. The regression also includes controls for loan amount, loan purpose indicators, conforming loan status, investor type as reported in HMDA, and discount points and lender credits expressed as a share of the loan amount.

[49]    Although the most common residential mortgages have a 30-year term, the average lifespan of a residential mortgage is seven years because most homeowners sell their homes or refinance before the mortgage term ends.

## VIII. "PLUS FACTORS" SUPPORT THE EXISTENCE OF THE ALLEGED CONSPIRACY AND ANTICOMPETITIVE INFORMATION EXCHANGE

137. Prominent antitrust scholars studying collusive behavior have identified "plus factors—economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action—that support an inference of collusion.[50] Each plus factor constitutes circumstantial evidence supporting active collusion rather than mere conscious parallelism. Factors providing the strongest probative value and leading to compelling collusion inferences are termed "super plus factors."[51]

138. Multiple plus factors establish that Defendants operate an unlawful price fixing cartel, including: (1) exchange of competitively sensitive information unavailable publicly; (2) presence of a price-verification scheme; (3) clear motive to conspire; (4) opportunities and invitations to collude; (5) increasingly concentrated markets; (6) substantial entry barriers; and (7) high consumer switching costs. These plus factors do not operate in isolation; their combination powerfully supports collusion inferences.

### A. Exchange of Competitively Sensitive Information

139. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private constitutes a "super plus factor" leading to a strong inference of active collusion.[52] Loan Originator Defendants, through Optimal Blue's platform, share

---

[50] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law,* 110 MICH. L. REV. 393, 393 (2011). *See also Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, U.S. Dep't of Justice, Antitrust Div., at 5-6 (Jan. 5, 2016), https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[51] *See* Kovacic*, supra* note 50 at 397.

[52] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. UNIV. L. REV. 1581, 1608 (2021).

competitively sensitive data about pricing strategies and profit margins—information unavailable publicly to borrowers (members of the Class). Optimal Blue provides data that would normally be kept confidential by Loan Originators to users (the Loan Originator Defendants), who should be competing on price to secure borrowers.

140.    A Loan Originator would suffer competitive disadvantages by unilaterally providing private data to competitors in real-time unless they were certain that rivals were likewise obligated to exchange their data. Rational actors would only engage in such behavior expecting to benefit from similar private information shared by competitors.

### B.    Price-Verification Scheme

141.    Optimal Blue provides Loan Originator Defendants with a price-verification scheme—the practice of a seller reporting to its competitors the details of completed transactions with specific customers."[53] "Postsale price verifications are more likely to be used as a monitoring device because they reveal to a firm's cartel partners its actual prices, which a firm in a competitive market would wish to keep secret."[54]

142.    Optimal Blue's PPE feeds real time lock data directly into the Business Analytics Tools used by Loan Originator Defendants. A Loan Originator Defendant's decision to share this price verification with Optimal Blue and, consequently, with its competitors, makes no competitive sense absent collusion.

### C.    Motive to Conspire

143.    Optimal Blue is paid large amounts of money for subscriptions by Loan Originator Defendants, so has a large monetary motive to enable the conspiracy. Optimal Blue provides loan

---

[53]    *Id.* at 1601.

[54]    *Id.* at 1601-02.

originators, including Loan Originator Defendants, with clear conspiracy motives by advertising that Business Analytics Tools deliver valuable information enabling Loan Originators to increase Mortgage Prices. The platform explicitly markets price coordination capabilities as competitive advantages.

## D. Opportunity to Collude

144. Optimal Blue's Business Analytics Tools provide Loan Originators with direct opportunities to coordinate Mortgage Prices, while Optimal Blue's advertisements constitute naked invitations to current and potential customers to engage in coordination.

145. Additionally, Defendant Optimal Blue hosts annual Summit client conferences. The Summit includes "exclusive market analysis" with "best practice sharing" among lenders, feedback forums, and multiple networking opportunities. Optimal Blue's chief marketing officer, Sara Holtz, described the Summit as bringing "the mortgage industry together for valuable content, knowledge-sharing, and opportunities to optimize technology and data to gain a competitive advantage."

146. Optimal Blue's Summit provides Loan Originator Defendants additional face-to-face collusion opportunities, advancing goals of reaching "their highest productivity and profit potential." Optimal Blue's Summit is not an ordinary trade meeting—it is an event hosted by the conspiracy facilitator.

## E. Increasingly Concentrated Market

147. The mortgage lending market is experiencing accelerating concentration. Conspiracies are easier to effectuate, maintain, and enforce in concentrated industries.[55] While the

---

[55] *See* Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. at 1590 ("[M]arkets with fewer firms are more susceptible to cartelization—a smaller

industry was historically fragmented, large Loan Originators now originate substantial percentages of annual loan locks. Over the past decade, particularly since 2020, the U.S. housing finance industry has undergone significant consolidation.[56]

148.    A prominent statistical rating organization reported that market share for the top five mortgage lenders rose from 24% in 2022 to 29% in 2024, while the top ten rose from 36% to 42% over the same period. This concentration facilitates coordination among fewer market participants.

**F.      High Barriers to Entry**

149.    Loan Originators and PPE platforms face substantial entry barriers, making the industry conducive to collusion. Barriers for Loan Originators include enormous costs of acquiring necessary capital, credit, and licensing to begin writing loans. Regulatory compliance presents one of the largest hurdles, requiring extensive federal and state licensing, reporting, and lending requirements. Loan Originators must register through the Nationwide Multistate Licensing System, with each state maintaining distinct approval processes, application fees, and compliance requirements (some states require physical in-state offices). Loan Originators must maintain approvals with government-sponsored entities and comply with numerous federal rules and oversight requirements, including Consumer Financial Protection Bureau (CFPB), TILA, Equal Credit Opportunity Act (ECOA), and Home Mortgage Disclosure Act regulations.

---

group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel.").

[56]    "The largest nonbank mortgage lenders have gained market share since 2022 'amid a reduction in capacity due to consolidation and the exit of smaller, sub-scale players.'" https://nationalmortgageprofessional.com/news/mortgage-market-consolidates-volatility-heightens.

150. Loan Originators must also possess funds and collateral to fund loans before secondary market sales. Additionally, substantial training costs exist for loan officers and personnel to operate PPE platforms. Even if new PPE platform competitors entered markets, switching costs for Loan Originators are prohibitive.

151. Optimal Blue operates as the industry-standard PPE platform. Significant learning curves would challenge loan officers adapting to comparable tools.

152. High entry barriers also exist for competitor PPE platforms. PPEs are provided by specialized vendors with mortgage industry expertise requiring sophisticated knowledge for design and implementation. Moreover, Loan Originators operate with significant compliance obligations, making any large-scale change in their IT and operating systems difficult, costly, and time consuming.

153. Optimal Blue has achieved remarkable scale—collecting data from 68% of the top 500 mortgage lenders nationally and pricing and locking approximately 40% of residential mortgages annually. New platforms would need to collect similar data volumes to compete effectively, requiring years and tremendous expense. New market entrants are therefore unlikely to discipline cartel pricing.

### G. High Switching Costs

154. Significant switching costs limit effective price competition in mortgage lending markets. In markets with low switching costs, consumers can cease purchasing particular sellers' products when prices become uncompetitive. Mortgages are neither inexpensive nor convenient to replace—refinancing can cost up to 6% of new loan values. These high switching costs insulate the conspiracy from competitive pressure.

## IX. ANTITRUST INJURY

155. Defendants' anticompetitive conduct produces the following effects:

a.  **Eliminated Competition:** Competition among Loan Originator Defendants has been restrained or eliminated regarding Mortgage Prices;

b.  **Fixed Pricing:** Mortgage Prices have been fixed, stabilized, or maintained at artificially inflated levels; and

c.  **Deprived Competition:** Plaintiffs and Class members have been deprived of free and open competition.

156.  Defendants' antitrust violations have caused Plaintiffs and Class members to pay higher Mortgages Prices than they would absent Defendants' illegal conspiracy. Consequently, Plaintiffs and Class members have suffered damages through overcharges paid on mortgages. This represents precisely the type of injury that antitrust laws were designed to punish and prevent.

## X.  RELEVANT ANTITRUST MARKET

157.  Defendants' price fixing agreement and information exchange constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain prices for residential real estate across the United States, and is *per se* illegal under the Sherman Act. This agreement among horizontal competitors was supported by a reciprocal exchange of competitively sensitive information through Defendant Optimal Blue, which was a facilitating practice in furtherance of Defendants' cartel. Further, because the conduct alleged here increased prices and reduced output, if the Court declines to analyze this case under the *per se* mode of analysis, the Court could analyze this case under the "quick look" mode of analysis. Under either mode, Plaintiffs are not required to prove that Defendants had market power in any defined antitrust market.

### A.  The Relevant Product Market Is the Origination of Residential Mortgages

158.  In the alternative, Plaintiffs also allege that Defendants' agreement to unlawfully exchange competitively sensitive business information, including recent, current, and future

pricing information, violates the antitrust laws even under the rule of reason because it harms and suppresses competition in the residential mortgage market.

159.    To the extent the Court ultimately applies the "rule of reason" mode of analysis to these claims—notwithstanding the horizontal nature of the alleged conspiracy—the relevant product market is the origination of residential mortgages. As Optimal Blue states repeatedly on its website, its platform supports over 35% of all mortgage rate locks in the country.[57] Optimal Blue acknowledges its network has market power, describing Optimal Blue PPE as "the mortgage industry's most widely used product, pricing, and eligibility engine", which, unlike other services which use "self-reported survey data", uses "mortgage lock data [that] is direct-source data that accurately reflects the in-process loans in lenders' pipelines."[58]

160.    From the perspective of the consumer, no product exists that can serve as an economic substitute for a residential mortgage, which is the only product that can facilitate the purchase of residential real estate for a buyer without the ability to self-finance the full purchase price.

---

[57]    *See Optimal Blue Mortgage Market Indices*, OPTIMAL BLUE, https://www2.optimalblue.com/obmmi (last updated Oct. 2, 2025)*; CME Group to Launch Mortgage Rate Futures in January 2025*, OPTIMAL BLUE (Nov. 19, 2025), https://www2.optimalblue.com/cme-group-to-launch-mortgage-rate-futures-in-january-2025*; Optimal Blue Releases May Data Findings, Announces Expansion of Monthly Report for More Comprehensive Lender Profitability Insights*, OPTIMAL BLUE (June 10, 2025), https://www2.optimalblue.com/optimal-blue-releases-may-data-findings-announces-expansion-of-monthly-report-for-more-comprehensive-lender-profitability-insights (" Data is sourced from the Optimal Blue PPE, which is used to price and lock more than one-third of all mortgages nationwide, and Optimal Blue's hedging and loan trading system, which supports approximately 40% of loans hedged and sold into the secondary market").

[58]    *Market Advantage: Mortgage Data Report July 2025*, OPTIMAL BLUE (Aug. 8, 2025), https://engage.optimalblue.com/hubfs/Market-Advantage/July2025.pdf.

54

### B. The Relevant Geographic Market Is National

161. To the extent a relevant geographic market needs to be defined in this action, it is the market for originating residential mortgages in the United States. Optimal Blue operates a nationwide business, with clients that service borrowers from across the U.S. Optimal Blue's Business Analytics Tools operate throughout the country in the same way, accounting for any regional variations in market conditions. In addition, non-depository institutions, like Rocket Mortgage, dominate retail mortgage lending, meaning consumers can shop for mortgages nationally. The Loan Originator Defendants locked mortgage rates across the United States and have increased prices nationally. Borrowers across the country are impacted by the conspiracy facilitated by Optimal Blue, as nationwide mortgage prices increase in tandem.

### C. Regional Submarkets

162. In addition, there are 393 submarkets for which Optimal Blue locks mortgages and offers its business analytics tools (the "Regional Submarket"). The U.S. Census Bureau and the Office of Management and Budget establish an MSA for each major metropolitan area in the country. The Census Bureau defines an MSA as a geographic entity associated with at least one core urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core measured by commuting ties. Nearly every Defendant operates in multiple MSAs across the country.

163. Plaintiffs allege that Defendants' scheme harmed competition in every MSA, each of which compromises a separate and distinct relevant regional geographic market under any potential Rule of Reason analysis (the "Regional Submarkets"). For illustrative purposes only, Plaintiffs provide details of twelve such Regional Submarkets:

#### 1. San Diego, California

164.    The San Diego Submarket corresponds to the Census Bureau's San Diego-Carlsbad-San Marcos MSA and includes all of San Diego County.

165.    Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within San Diego Submarket. Among loans originated by the 20 largest Loan Originators in the San Diego Submarket, loan originations by companies using Optimal Blue products account for approximately 89% of residential loan origination value.

166.    Within the San Diego Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) First Community Mortgage, Inc; (22) Movement Mortgage; and (23) Beeline.

### 2.    Chicago, Illinois

167.    The Chicago Submarket corresponds to the Census Bureau's Chicago-Naperville-Elgin MSA, and includes 14 counties in Illinois, Indiana, and Wisconsin.

168.    Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Chicago Submarket. Among loans originated by the 20 largest Loan Originators in the Chicago Submarket, loan

originations by companies using Optimal Blue products account for approximately 84% of residential loan origination value.

169. Within the Chicago Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) Movement Mortgage; and (23) Beeline.

### 3. Miami, Florida

170. The Miami Submarket corresponds to the Census Bureau's Miami-Fort Lauderdale-Pompano Beach MSA, and includes Miami-Dade County, Broward County, and Palm Beach County.

171. Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Miami Submarket. Among loans originated by the 20 largest Loan Originators in the Miami Submarket, loan originations by companies using Optimal Blue products account for approximately 81% of residential loan origination value.

172. Within the Miami Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.;

(5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) First Community Mortgage, Inc; (23) Movement Mortgage; and (24) Beeline.

### 4. Los Angeles, California

173. The Los Angeles Submarket corresponds to the Census Bureau's Los Angeles-Long Beach-Anaheim MSA and includes Los Angeles and Orange counties.

174. Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Los Angeles Submarket. Among loans originated by the 20 largest Loan Originators in the Los Angeles Submarket, loan originations by companies using Optimal Blue products account for approximately 77% of residential loan origination value.

175. Within the Los Angeles Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Movement Mortgage; and (22) Beeline.

### 5.     San Francisco, California

176.   The San Francisco Submarket corresponds to the Census Bureau's San Francisco-Oakland-Fremont MSA, and includes San Francisco, Alameda, Marin, Contra Costa, and San Mateo counties.

177.   Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within San Francisco Submarket. Among loans originated by the 20 largest Loan Originators in the San Francisco Submarket, loan originations by companies using Optimal Blue products account for approximately 76% of residential loan origination value.

178.   Within the San Francisco Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) First Community Mortgage, Inc; (22) Movement Mortgage; and (23) Beeline.

### 6.     New York, New York

179.   The New York Submarket corresponds to the Census Bureau's New York-Newark-Jersey City MSA, and spans parts of New York, New Jersey, and Pennsylvania.

180.   Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within the New York

Submarket. Among loans originated by the 20 largest loan originators in the New York Submarket, loan originations by companies using Optimal Blue products account for approximately 76% of residential loan origination value.

181.     Within the New York Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; and (21) Movement Mortgage.

### 7.     Riverside, California

182.     The Riverside Submarket corresponds to the Census Bureau's Riverside-San Bernardino-Ontario, California MSA and includes Riverside and San Bernardino counties.

183.     Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Riverside Submarket. Among loans originated by the 20 largest Loan Originators in the Riverside Submarket, loan originations by companies using Optimal Blue products account for approximately 75% of residential loan origination value.

184.     Within the Riverside Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8)

60

U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) First Community Mortgage, Inc; (22) Movement Mortgage; and (23) Beeline.

### 8. Seattle, Washington

185. The Seattle Submarket corresponds to the Census Bureau's Seattle-Tacoma-Bellevue MSA and contains the three largest counties in the state: King, Pierce, and Snohomish counties.

186. Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Seattle Submarket. Among loans originated by the 20 largest Loan Originators in the Seattle Submarket, loan originations by companies using Optimal Blue products account for approximately 73% of residential loan origination value.

187. Within the Seattle Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20)

Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) First Community Mortgage, Inc; and (23) Movement Mortgage.

### 9. Phoenix, Arizona

188. The Phoenix Submarket corresponds to the Census Bureau's Phoenix-Mesa-Chandler MSA and includes all of Maricopa and Pinal counties.

189. Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Phoenix Submarket. Among loans originated by the 20 largest Loan Originators in the Phoenix Submarket, loan originations by companies using Optimal Blue products account for approximately 73% of residential loan origination value.

190. Within the Phoenix Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) First Community Mortgage, Inc; (23) Movement Mortgage; and (24) Beeline.

### 10. Atlanta, Georgia

191. The Atlanta Submarket corresponds to the Census Bureau's Atlanta-Sandy Springs-Alpharetta MSA.

192.    Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Atlanta Submarket. Among loans originated by the 20 largest Loan Originators in the Atlanta Submarket, loan originations by companies using Optimal Blue products account for approximately 73% of residential loan origination value.

193.    Within the Atlanta Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) FirstBank Mortgage; (22) Churchill Mortgage Corporation; (23) First Community Mortgage, Inc; (24) Movement Mortgage; and (25) Beeline.

### 11.    Houston, Texas

194.    The Houston Submarket corresponds to the Census Bureau's San Houston-The Woodlands-Sugarland MSA and includes all of Harris County as well as the surrounding counties of Montgomery, Liberty, Austin, Chambers, Waller, Fort Bent, Brazoria, and Galveston.

195.    Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Houston Submarket. Among loans originated by the 20 largest Loan Originators in the Houston Submarket, loan originations by companies using Optimal Blue products account for approximately 72% of residential loan origination value.

63

196. Within the Houston Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) First Community Mortgage, Inc; (23) Movement Mortgage; and (24) Beeline.

### 12. Denver, Colorado

197. The Denver Submarket corresponds to the Census Bureau's Denver-Aurora-Lakewood MSA and includes ten Colorado Counties: the City and County of Denver, Arapahoe County,

198. Jefferson County, Adams County, Douglas County, the City and County of Broomfield, Elbert County, Park County, Clear Creek County, and Gilpin County.

199. Through its Business Analytics Tools, Defendant Optimal Blue collects and shares pricing information for a high concentration of residential mortgages within Denver Submarket. Among loans originated by the 20 largest Loan Originators in the Denver Submarket, loan originations by companies using Optimal Blue products account for approximately 70% of residential loan origination value.

200. Within the Denver Submarket, the following Defendants originate residential mortgages priced using Optimal Blue's Business Analytics Tools: (1) Rocket Mortgage, LLC; (2) United Wholesale Mortgage, LLC; (3) Wells Fargo Bank, N.A.; (4) JPMorgan Chase Bank, N.A.;

(5) Loandepot.com; (6) Bank of America; (7) Fairway Independent Mortgage Corporation; (8) U.S. Bank National Association; (9) Freedom Mortgage Corporation; (10) Guaranteed Rate, Inc.; (11) NewRez, LLC; (12) CrossCountry Mortgage, LLC; (13) PennyMac Loan Services, LLC; (14) Guild Mortgage Company, LLC; (15) Citibank, N.A.; (16) Flagstar Bank, N.A.; (17) New American Funding, LLC; (18) CMG Mortgage, Inc.; (19) AmeriSave Mortgage Corporation; (20) Better Mortgage Corporation; (21) Churchill Mortgage Corporation; (22) First Community Mortgage, Inc; (23) Movement Mortgage; and (24) Beeline.

## XI.    CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities in the United States and its territories that entered into a residential mortgage with any Loan Originator Defendant pricing that loan using Optimal Blue Business Analytics Tools, at any time during the period of October 3, 2021, until Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

202.    Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

203.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiffs believe that, due to the nature of the residential mortgage market, there are likely millions of Class members in the United States.

204. Common questions of law and fact exist as to all members of the Class. Plaintiffs and the other members of the Class were injured by the same unlawful price-fixing conspiracy, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to the following:

a. Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize mortgage prices in the United States;

b. Whether Defendants and their co-conspirators engaged in an illegal information exchange;

c. The duration of the conspiracy and/or information exchange alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d. Whether such combination or conspiracy violated the federal antitrust laws;

e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to plaintiffs and the other members of the Class;

f. Whether Defendants caused Plaintiffs and the other members of the Class to suffer damages in the form of overcharges on mortgages;

g. The appropriate class-wide measure of damages; and

h. The nature of appropriate injunctive relief to restore competition in the housing finance market.

205. Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and the other members of the

Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rates for mortgages originated by Loan Originator Defendants.

206. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

207. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

208. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

209. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

210. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## XII. CONTINUING VIOLATION

211. Plaintiffs' Sherman Act claims, which are subject to a four-year statute of limitations period, are timely under the continuing violations doctrine. The conspiracy alleged above began at least as early as June 2019 and continued into the non-time-barred Class Period, beginning on October 3, 2021 and continuing to the present.

212. This complaint alleges Loan Originator Defendants unlawfully coordinated their residential Mortgage Pricing through Optimal Blue's Business Analytics Tools within the four-year statutory period, which continues through the present.

213. As a result of the anticompetitive conduct challenged in this complaint, throughout the Class Period and to the present, Loan Originator Defendants were able to and did inflate prices for residential mortgages.

214. Plaintiffs and members of the Class purchased residential mortgages directly from a Loan Originator Defendant at artificially inflated prices, caused by the conduct challenged in this complaint, throughout the Class Period.

215. Thus, each Loan Originator Defendant's origination of residential mortgages at artificial and non-competitive prices constituted a new overt act, causing injury to the Class.

216. Accordingly, Plaintiffs and members of the Class were injured and may recover for damages suffered at any point during the Class Period.

217. Defendants' unlawful acts and practices described above continue to this day.

## XIII. CLAIMS FOR RELIEF

### COUNT I
### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

218. Plaintiffs repeat the allegations set forth above as if fully set forth herein. Beginning at a time currently unknown to Plaintiffs, but at least as early as June 2019 (further investigation

and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

219. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rates they charged for residential mortgages and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

220. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharges on residential mortgages.

221. Defendants' anticompetitive conduct had the following effects, among others:

a. Competition among the Loan Originator Defendants has been restrained or eliminated with respect to mortgage prices;

b. The price of residential mortgages has been fixed, stabilized, or maintained at artificially high levels; and

c. Plaintiffs and members of the Class have been deprived of the benefits of free and open competition between and among Defendants.

222. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

223.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**COUNT II**
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

224.     Plaintiffs repeat the allegations set forth above as if fully set forth herein. Beginning at a time currently unknown to Plaintiffs, but at least as early as June 2019 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into an agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is concerted action and an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

225.     The relevant product market is residential mortgages, and the geographic market is the continental United States.

226.     An increase in Mortgage Prices could be imposed collectively by Defendants without causing many customers to switch their purchases to another product. Residential mortgages constitute a unique product.

227.     The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about Mortgage Pricing. Defendants' information exchanges through Optimal Blue allowed them to compare their prices with their competitors and collectively raise prices.

228.     Each of the Loan Originator Defendant's regular information exchanges through Optimal Blue reflected the concerted action between and among horizontal competitors in the residential mortgage industry.

229.     Each Loan Originator Defendant furnished competitively sensitive information regarding Mortgage Pricing to other Loan Originator Defendants through Defendant Optimal Blue with the understanding that it would be reciprocated.

230.     The agreement to regularly exchange detailed, and non-public information about recent, current, and future pricing suppressed competition between and among the Loan Originator Defendants and enabled them to coordinate and maintain their price increases.

231.     When companies competing for the same customers exchange competitively sensitive information, including pricing information, it reduces the incentives to compete on price. Here, the Loan Originator Defendants used the data obtained through Defendant Optimal Blue to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing for Mortgage Pricing in the residential mortgage industry. This strategic information was a material factor in the Defendants' parallel decisions to inflate the Mortgage Prices that Plaintiffs paid during the Class Period.

232.     The Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between and among the Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition.

233.     The information exchange agreement has had the effect of (1) suppressing competition among the Loan Originator Defendants in the residential mortgage industry in the United States and (2) inflating, increasing, and stabilizing Mortgage Prices during the Class Period. Plaintiffs and the other members of the Class have been injured and will continue to be injured in the form of overcharges on mortgage prices.

234.     This information exchange has been undertaken in furtherance of a price-fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

235.     Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## PRAYER FOR RELIEF

236.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof,

and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E. The Court award Plaintiffs and the other members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 3, 2025          Respectfully Submitted,

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com

73

tony@hsglawgroup.com

Robin A. van der Meulen (*pro hac vice*
forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6443
rvandermeulen@scott-scott.com

Carmen A. Medici (*pro hac vice* forthcoming)
Jimmy S. McBirney (*pro hac vice* forthcoming)
Isabella De Lisi (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
cmedici@scott-scott.com
jmcbirney@scott-scott.com
idelisi@scott-scott.com

Patrick McGahan (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com

Brian D. Clark (*pro hac vice* forthcoming)
Arielle S. Wagner (*pro hac vice* forthcoming)
Olivia T. Levinson (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
aswagner@locklaw.com
otlevinson@locklaw.com

Kyle Pozan (*pro hac vice* forthcoming)

74

**LOCKRIDGE GRINDAL NAUEN PLLP**
1165 North Clark Street, Suite 700
Chicago, IL 60610
Telephone: (312) 205-8968
kjpozan@locklaw.com